# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JESSICA S. FORD,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:13cv00061 |
| | ) | **MEMORANDUM OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

## *I. Background and Standard of Review*

Plaintiff, Jessica S. Ford, ("Ford"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4ᵗʰ Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4ᵗʰ Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the

Case 2:13-cv-00061-PMS   Document 14   Filed 03/30/15   Page 1 of 32   Pageid#: 746

case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Ford protectively filed her application for SSI on January 28, 2010, alleging disability as of January 2, 2010, due to seizures, low blood pressure, anxiety attacks, Stevens-Johnson Syndrome,[1] migraines and photosensitivity. (Record, ("R."), at 155-58, 180, 191, 194.) The claim was denied initially and on reconsideration. (R. at 85-87, 90-91, 93-95.) Ford then requested a hearing before an administrative law judge, ("ALJ"), (R. at 98-99), which was held on May 8, 2012, and at which Ford was represented by counsel. (R. at 60-81.)

By decision dated August 2, 2012, the ALJ denied Ford's claim. (R. at 32-54.) The ALJ found that Ford was in the "adolescents" age group on the date of the application, and attained 18 years of age on January 6, 2010.[2] (R. at 36.) The ALJ found that Ford had not engaged in substantial gainful activity since the date of the application. (R. at 36.) The ALJ determined that the medical evidence established that, before attaining age 18, Ford suffered from severe impairments, including a seizure disorder; interstitial cystitis; an anxiety disorder, not otherwise specified, with mixed anxiety and depressed mood; and post-traumatic stress disorder,

---

[1] Stevens-Johnson Syndrome is a sometimes fatal form of erythema multiforme presenting with a flulike prodrome, and characterized by systemic, as well as more severe, mucocutaneous lesions. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY FOURTH EDITION, ("Dorland's"), 1644 (27th ed. 1988).

[2] Although the ALJ recites January 7 as Ford's date of birth, he states that she attained age 18 on January 6, 2010. (R. at 36.) Multiple other notations in the record indicate that Ford's date of birth is January 7. (R. at 155, 159, 176, 191.) In any event, Ford would have attained 18 years of age by the time of the filing of the claim. There would have been a period of days, however, between the alleged onset date and the attainment of 18 years of age. The ALJ analyzed Ford's claim under the childhood disability standard for the period of time prior to Ford's 18th birthday, and under the adult disability standard thereafter.

("PTSD"); but that she did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 37.) The ALJ also found that, before attaining age 18, Ford did not have an impairment or combination of impairments that functionally equaled the listings. (R. at 37-45.) Therefore, because Ford did not have an impairment or combination of impairments that met, medically equaled any listing or functionally equaled the listings, the ALJ found that she was not disabled prior to attaining age 18. (R. at 45.) The ALJ found that Ford had not developed any new impairment or impairments or had an impairment or combination of impairments that met or medically equaled a listed impairment since attaining age 18. (R. at 45-46.) The ALJ found that, since attaining age 18, Ford had the residual functional capacity to perform simple, routine, repetitive, low-stress[3] light work[4] that required no climbing of ladders, ropes or scaffolds, no operation of moving machinery and no work around unprotected heights, no more than occasional climbing of ramps or stairs, no more than frequent stooping, kneeling, crouching, crawling or balancing and no more than occasional interaction with the public or co-workers. (R. at 47.) The ALJ found that Ford had no past relevant work. (R. at 53.) The ALJ found that, since attaining age 18, considering Ford's education, work history and residual functional capacity and the testimony of a vocational expert, Ford could perform other jobs existing in significant numbers in the national economy, including jobs as a cleaner, an electronics assembler and a small products assembler II. (R. at 53-54.) Therefore, the ALJ found that Ford was not under a

---

[3] The ALJ defined "low-stress" work as having only occasional decision making and only occasional changes in the work setting.

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2014).

-3-

disability as defined under the Act since she attained age 18 and was not eligible for benefits. (R. at 54.) *See* 20 C.F.R. § 416.920(g) (2014).

After the ALJ issued his decision, Ford pursued her administrative appeals, (R. at 8-11), but the Appeals Council denied her request for review. (R. at 1-6.) Ford then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2014). The case is before this court on Ford's motion for summary judgment filed July 1, 2014, and the Commissioner's motion for summary judgment filed August 4, 2014.

## II. Facts[5]

Ford was born in 1992, (R. at 155, 176), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). She has a high school education with special education courses. (R. at 65, 181.) Ford testified that she was working five days a week for five hours daily as a cashier at Walmart at the time of the hearing, as her primary care physician had limited her working hours approximately seven or eight months previously due to seizures and worsened panic attacks. (R. at 66-67, 73.) She testified that despite taking Lamictal for her seizures, she continued to have one a week prior to the hearing. (R. at 67.) Ford testified that she experienced both grand mal[6] and petit mal[7] seizures, noting that she had a grand mal seizure at

---

[5] The relevant time period for determining disability in this case is from January 2, 2010, Ford's alleged onset date, through August 2, 2012, the date of the ALJ's decision. To the extent that medical evidence outside of this period is included in this Opinion, it is for clarity of the record.

[6] A grand mal seizure frequently is preceded by an aura, and in which a sudden loss of consciousness is immediately followed by generalized convulsions. *See* Dorland's at 568.

-4-

least every two months. (R. at 67.) Ford testified that it took her approximately 45 minutes to recover from a seizure, and she had been forced to leave work on approximately 20 occasions after suffering one since her hours were reduced. (R. at 71, 73.) She stated that her medication reduced the frequency and severity of her seizures most of the time. (R. at 72-73.) Ford testified that she did not handle stress very well and that she had been diagnosed with anxiety attacks, for which she took Xanax. (R. at 68-69.) She stated that she had an anxiety attack approximately once weekly or every couple of weeks, lasting for about 30 minutes. (R. at 68.) Ford stated that she had left her job six or seven times due to anxiety attacks. (R. at 74.) Ford testified that her doctor had given her leaves of absences, as well. (R. at 75.) She stated her belief that working full-time would result in seizures and more anxiety. (R. at 70.) She stated that she had been treated at Woodridge, a psychiatric hospital, and had received counseling thereafter, but was not then-currently receiving counseling due to a lack of insurance. (R. at 65, 70.)

Melissa Brassfield, a vocational expert, also was present and testified at Ford's hearing. (R. at 76-80.) Brassfield classified Ford's work at Walmart as a cashier/checker, although not substantial gainful activity, as semi-skilled and light. (R. at 77.) She testified that a hypothetical individual who could perform simple, routine, repetitive, low-stress (defined as requiring only occasional decision making and only occasional changes in the work setting) light work, but who could never climb ladders, ropes or scaffolds, who could occasionally climb ramps or stairs, who could frequently stoop, kneel, crouch, crawl and balance, who should avoid the operation of moving machinery and working around unprotected heights and who could have no more than occasional interaction with the public and with

[7] A petit mal seizure involves a sudden momentary loss of consciousness with only minor myoclonic jerks, seen especially in children. *See* Dorland's at 568.

co-workers, could not perform Ford's past work as a cashier/checker. (R. at 77-78.) Brassfield testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a housekeeping cleaner, an electrical accessory assembler and a small products assembler I. (R. at 78.) Brassfield next testified that the same hypothetical individual, but who also would miss more than two days of work monthly on an unexcused or unscheduled basis could perform no competitive work. (R. at 78.) Lastly, Brassfield testified that a hypothetical individual who was limited to working a maximum of five hours per day and five days per week could not perform any full-time jobs, as those are classified as 40 hours per week. (R. at 79.)

In rendering her decision, the ALJ reviewed records from Dr. Anna Kosentka, M.D., a pediatric neurologist; Woodridge Hospital; Wise County Behavioral Health Services; Lonesome Pine Pediatrics; Wise County Public Schools; Associated Neurologists of Kingsport; Dr. Felix E. Shepherd, Jr., M.D.; Wellmont Lonesome Pine Hospital; Medical Associates of Southwest Virginia; Frontier Health Assessment & Forensic Services; J. McClain, Psy.D., a doctor of psychology; Dr. Joseph Duckwall, M.D., a state agency physician; Norton Community Hospital; Spectrum Lab Network; Medical Associates of Big Stone Gap; Dr. R. Scott Macdonald, M.D., a neurologist; Nighthawk Radiology; Dr. Sam Vorkpor, M.D.; and Eric Johnson, Ph.D., a licensed psychologist. Ford's attorney submitted additional medical records from Dr. Macdonald; Dr. David K. Garriott, M.D.; Medical Associates of Big Stone Gap; and Mountain Empire Neurological Associates to the Appeals Council.[8]

---

[8] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take these new findings into

The medical records show that Ford suffered her first seizure in December 2005, at the age of approximately 14 and was treated with Lamictal. (R. at 236, 507-20, 640-41.) In December 2006, Ford was evaluated by Dr. Anna Kosentka, M.D., a pediatric neurologist, who diagnosed partial complex seizures with secondary generalization; and a history of migraine headaches. (R. at 236-38.) Ford continued to see Dr. Kosentka from April 6, 2007, through November 1, 2007. (R. at 239-41.) Over this time, Ford independently reduced her Lamictal dosage by half, and thereafter, independently discontinued it altogether. (R. at 241, 524.) On October 11, 2007, Ford advised her primary care physician that she had suffered two seizures the previous two weeks, and Lamictal was restarted. (R. at 524.) On November 1, 2007, Dr. Kosentka ordered an EEG, which was "moderately abnormal … secondary to epileptiform activity. …" (R. at 239.)

Ford did not seek any further neurological treatment until April 10, 2009, when she saw Dr. R. Scott Macdonald, M.D., who diagnosed a history of seizure disorder, possibly primary generalized seizures. (R. at 385-86.) A physical examination was unremarkable, and Dr. Macdonald ordered blood work and refilled Ford's lamotrigine.[9] (R. at 386.)

From May 7, 2009, through September 19, 2009, Ford presented to the emergency department at Lonesome Pine Hospital, ("Lonesome Pine"), on three occasions after suffering possible seizures. (R. at 405-06, 409-10, 417-18, 557-58.) Physical examinations were normal, as were CT scans. (R. at 407, 411, 419.) Follow-up appointments with Dr. Macdonald after these emergency department

account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

[9] Lamotrigine is a generic formulation of Lamictal.

-7-

visits also yielded normal findings on physical examination. (R. at 382-84.) A May 27, 2009, EEG was abnormal, but was inconclusive as to whether there were primary or secondary generalized seizure bursts. (R. at 387.) Dr. Macdonald was not convinced that Ford had suffered seizures, and he considered whether she might be experiencing pre-syncopal symptoms. (R. at 382, 384.) He scheduled a tilt table test,[10] which was positive, with initial tachycardia, them bradycardia and episode of asystole.[11] (R. at 381.) He referred Ford for a cardiology evaluation.[12] (R. at 381.) Dr. Macdonald diagnosed a history of seizure disorder and positive tilt table testing with syncope. (R. at 381.)

Over this time, Ford also advised Dr. Macdonald that she was doing well on her medications. (R. at 379.) However, on September 24, 2009, Dr. Macdonald noted that lab work from July indicated that she was not taking the Lamictal. (R. at 378.) Ford admitted that she had stopped taking the medication, but had been compliant for the previous five days. (R. at 378.) However, she stated that she had a suspected seizure episode earlier that month. (R. at 378.) A CT scan of Ford's brain was, again, negative. (R. at 378.) Dr. Macdonald advised Ford that the seizure medication was effective only if she took it on a regular basis. (R. at 378.)

The record also reveals that Ford was admitted to Woodridge, an inpatient psychiatric facility, on August 12, 2009, for approximately one week after

---

[10] A tilt table test is used to evaluate the cause of unexplained fainting. *See* www.mayoclinic.org/tests-procedures/tilt-table-test/basics/definition/prc-20019879 (last visited March 30, 2015.)

[11] Asystole refers to cardiac standstill or arrest; absence of a heartbeat. *See* Dorland's at 160.

[12] There is no such cardiology evaluation contained in the record.

-8-

threatening to overdose on medications following an argument with her mother. (R. at 242-44.) Her Global Assessment of Functioning, ("GAF"),[13] score on admission was 30.[14]  (R. at 242.) She received an initial diagnosis of PTSD and oppositional defiant disorder.  (R. at 242.)  Ford reported that she had not taken her prescribed Lamictal or blood pressure medication since March. (R. at 249.)  During counseling, Ford revealed a history of sexual abuse by a stepbrother at the age of 13, but she was resistant to psychiatric treatment. (R. at 243.) Upon discharge on August 18, 2009, Ford was diagnosed with PTSD; poor coping skills and family discord; and her then-current GAF score was placed at 52.[15]  (R. at 244.) Ford and her family received further counseling services at Wise County Behavioral Health Services. (R. at 258-63, 267-72, 276-81.)

On January 15, 2010, Ford was seen at Lonesome Pine Pediatrics with complaints of an ear ache, burning with urination for the previous two weeks and pain in the lower back. (R. at 314.) An x-ray revealed kidney stones, and Ford was prescribed Cipro. (R. at 314.) The following day, she presented to the emergency department at Lonesome Pine with complaints of painful urination and back pain. (R. at 423-24, 552-54.) A physical examination was unremarkable. (R. at 424, 552.) She was diagnosed with dysuria and was prescribed Cipro and Pyridium.  (R. at 424.)

---

[13] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[14] A GAF score of 21 to 30 indicates that an individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment … OR inability to function in almost all areas…."  DSM-IV at 32.

[15] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning.…"  DSM-IV at 32.

Ford saw Dr. Sam G. Vorkpor, M.D., on February 23, 2010, to establish primary care. (R. at 448.) She complained of a sore throat and weakness, and she reported that her last seizure was five months previously. (R. at 448.) She reported anxiety and previous suicidal ideation with a plan to cut herself, as well as sexual abuse, which caused significant stress. (R. at 448.) A physical examination was normal, with the exception of a positive strep test. (R. at 448.) Dr. Vorkpor diagnosed strep pharyngitis, seizure disorder and anxiety, and he prescribed antibiotics. (R. at 448.) On March 10, 2010, Ford had no complaints, and a physical examination was entirely unremarkable. (R. at 447.) On April 14, 2010, Ford complained to Dr. Vorkpor of right neck spasm, and she exhibited impaired range of motion of the neck and tenderness. (R. at 443.) Dr. Vorkpor diagnosed right neck spasms and questionable torticollis, and he prescribed Valium and Skelaxin. (R. at 443.) By April 16, 2010, Ford reported that her spasms were decreasing, and Dr. Ford advised her to continue taking the medications as prescribed. (R. at 442.)

On April 21, 2010, Ford again presented to the emergency department at Lonesome Pine with complaints of back pain, pain with urination, nausea and vomiting. (R. at 425-26, 549-51.) She reported that her OB/GYN had diagnosed a urinary tract infection the previous day and prescribed Pyridium, but she felt no better. (R. at 425.) Ford's mother advised that Ford was not taking her seizure medication and that she did not take any antibiotic recently. (R. at 426.) Ford was diagnosed with right flank pain and received Flexeril and ibuprofen. (R. at 426, 550.)

When Ford saw Dr. Vorkpor on May 3, 2010, she complained of having experienced panic attacks occurring for several days to a week, which were aggravated by the death of an ex-boyfriend in a motor vehicle accident. (R. at 441.) Dr. Vorkpor diagnosed a panic disorder and anxiety, and he prescribed a one-month supply of Xanax. (R. at 441.) Dr. Vorkpor made a return appointment in one month's time to determine whether Ford required long-term use of Xanax. (R. at 441.) Ford presented to the emergency department at Lonesome Pine on May 7, 2010, with complaints of abdominal pain and back pain with nausea, dysuria and urinary frequency. (R. at 427-28.) She was diagnosed with a urinary tract infection and was prescribed Bactrim and Phenergan. (R. at 428.) Ford returned to Dr. Vorkpor on May 13, 2010, complaining of a headache after being hit in the head with a glass bottle. (R. at 440.) She reported that she had experienced no seizures for more than eight months, and she voiced no psychiatric complaints. (R. at 440.) On June 3, 2010, one month from the date Dr. Vorkpor prescribed Xanax, no mention was made of Ford's psychiatric condition. (R. at 438.) Dr. Vorkpor diagnosed a urinary tract infection and urinary frequency, and he prescribed Macrobid. (R. at 438.)

On June 10, 2010, Stephen Saxby,[16] completed both a Psychiatric Review Technique form, ("PRTF"), and a Childhood Disability Evaluation Form. (R. at 343-67, 368-75.) Saxby found that Ford suffered from depression and PTSD, but that there was insufficient evidence to determine the degree of limitation that these conditions caused Ford and that a possible consultative examination was needed to fully document their severity. (R. at 363, 367, 374.) Saxby further noted that Ford had failed to return certain paperwork, including those relating to her seizure

---

[16] Saxby's professional title is not contained in the record.

activity, activities of daily living, pain and work history since attaining age 18. (R. at 367, 374.) On June 15, 2010, Dr. Pamela Duff, M.D., a state agency physician, completed a Case Analysis, affirming Saxby's finding of insufficient evidence. (R. at 376.)

Ford received treatment from Dr. Felix E. Shepherd, Jr., M.D., a urologist, from July 30, 2010, through September 8, 2010, for complaints of recurrent bladder infections. (R. at 388-400.) On July 30, 2010, she listed her active medications as "none." (R. at 395.) A renal ultrasound showed no hydronephrosis, and an ultrasound of the bladder showed a trace amount of fluid remaining in the postvoid bladder images. (R. at 399-400.) Dr. Shepherd diagnosed chronic interstitial cystitis. (R. at 396.) Over this time, Dr. Shepherd instructed Ford to void every two hours, he prescribed medications, he ordered a bladder irritant diet, and he performed three bladder irrigations. (R. at 390, 392-94, 397.) On September 8, 2010, Dr. Shepherd recommended that Ford undergo a cystoscopy versus treatment with medication. (R. at 390.)

Ford continued to treat with Dr. Vorkpor from September 2, 2010, through January 18, 2011. (R. at 435-37.) At these visits, she complained of rapid weight gain and neck pain after suffering a possible seizure while sleeping. (R. at 435, 437.) Physical examinations were entirely normal, except for some difficulty with range of motion of the neck on January 18, 2011. (R. at 435-37.) Dr. Vorkpor discussed diet and exercise with Ford, and he advised her to continue taking Valium. (R. at 435, 437.)

Ford presented to the emergency department at Lonesome Pine Hospital on October 30, 2010, with complaints of headache with nausea, vomiting and left arm numbness. (R. at 429-30.) A CT scan of Ford's head yielded no acute intracranial findings. (R. at 431.) She was diagnosed with complex migraine and prescribed Phenergan. (R. at 430.)

Ford saw Elizabeth A. Jones, M.A., a senior psychological examiner, for a consultative psychological examination at the request of the state agency on February 22, 2011. (R. at 466-72.) Ford's grooming and hygiene were excellent, her affect was mildly blunted, and she was extremely cooperative with the evaluation procedures, exhibiting a high degree of motivation and persistence at tasks. (R. at 466.) She stated that her last seizure was in October 2010, and she reported that she had been taking Xanax for one to two months, but had not been in counseling since 2009. (R. at 467.) Ford stated that she was considering taking online nursing classes. (R. at 468.) Eye contact was excellent, Ford did not have difficulty with attention or concentration, and she followed directions without repetition. (R. at 468.) Mild psychomotor agitation was noted, and Ford needed excessive reassurance during administration of the measure of intelligence, indicative of anxiety. (R. at 467.) There was no evidence of any distorted thought processes, and she was rational and alert. (R. at 469.)

Ford endorsed symptoms of depression and admitted past suicidal thoughts, but denied any such then-current thoughts. (R. at 469.) She reported symptoms of anxiety since the age of 13, when she was molested by a family member, but stated it was worsening. (R. at 469.) Ford reported her activities of daily living to include helping her grandmother fix breakfast and cleaning up, making her bed, cleaning

-13-

her room, doing laundry, watching television, preparing food for herself and going outside, weather permitting. (R. at 469.) She also stated that she talked with her boyfriend on the phone. (R. at 469.) Ford reported that she had driven unaccompanied only twice due to her fear of having a seizure. (R. at 469.) Ford's self-help skills appeared to be excellent, and initiative and effectiveness were adequate. (R. at 469.) She had no difficulty relating to Jones, who opined that Ford should have no difficulty relating to others. (R. at 470.)

Jones administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), on which Ford obtained a full-scale IQ score of 82, placing her in the low average range of intelligence. (R. at 470.) Jones opined that Ford was mildly limited in her ability to understand and remember and may have difficulty understanding and remembering detailed instructions. (R. at 471.) However, she found that Ford was capable of understanding and remembering simple instructions. (R. at 471.) Jones further opined that Ford had mild limitations in her ability to sustain concentration and persistence, may have difficulty working in coordination with others and may have difficulty dealing with the general public and co-workers due to anxiety. (R. at 471.) Jones found that Ford was mildly limited in the area of adaptation and may have difficulties setting realistic goals and making plans independently of others. (R. at 471.) However, she found that Ford appeared to be aware of normal hazards and took appropriate precautions. (R. at 471.)

Jones diagnosed Ford with an anxiety disorder, not otherwise specified, with mixed anxiety and depressed mood; and she assessed her then-current GAF score

-14-

at 60. (R. at 471.) Diane L. Whitehead, Ph.D., a licensed clinical psychologist, also signed the evaluation. (R. at 472.)

Jo McClain, Psy.D., a doctor of psychology, completed a PRTF on March 5, 2011, finding that Ford suffered from an anxiety disorder, not otherwise specified, with social anxiety and excessive worry about seizures. (R. at 474-86.) McClain opined that Ford was mildly restricted in her activities of daily living and had mild difficulties in maintaining concentration, persistence or pace, but had moderate difficulties in maintaining social functioning. (R. at 484.) McClain opined that Ford had suffered no repeated episodes of decompensation of extended duration. (R. at 484.) McClain found the evaluation performed by Jones and Whitehead to be supported by the evidence of record. (R. at 486.) McClain also completed a Childhood Disability Evaluation, finding that Ford had a less than marked limitation in her ability to acquire and use information and in the area of her health and physical well-being and no limitation in her ability to attend and complete tasks, to interact and relate with others, to move about and manipulate objects and to care for herself. (R. at 487-94.) Therefore, McClain concluded that Ford's impairment or combination of impairments did not functionally equal a listed impairment. (R. at 491.) Dr. Joseph Duckwall, M.D., a state agency physician, agreed with these findings on March 8, 2011. (R. at 488.)

Dr. Duckwall also completed a physical assessment of Ford on March 8, 2011, finding that she could perform light work that required no more than occasional climbing of ramps and stairs and no climbing of ropes, ladders or scaffolds. (R. at 495-99.) He imposed no other postural, manipulative, or visual limitations. (R. at 497.)

Ford returned to Dr. Vorkpor on August 3, 2011, with complaints of nausea, abdominal pain and vomiting for the previous week. (R. at 583-87.) She was alert, cooperative, well-groomed, oriented and in no acute distress. (R. at 584.) A physical examination was unremarkable, and Dr. Vorkpor diagnosed abdominal pain. (R. at 584-85.)

Ford saw Dr. Macdonald on August 9 and August 30, 2011, more than a year after her previous visit. (R. at 590-91.) On both occasions, Ford reported having suffered possible seizures. (R. at 590-91.) On August 9, 2011, Ford admitted that she had, again, independently reduced the dosage and frequency of her levetiracetam. (R. at 590.) A physical examination was normal, as Ford was alert with normal speech, no nystagmus or dysmetria and full peripheral strength. (R. at 591.) Likewise, on August 30, 2011, a physical examination showed normal tongue protrusion, symmetric facial movement, full eye movements, no nystagmus, no dysmetria and a normal gait. (R. at 590.) Dr. Macdonald increased Ford's medication dosage. (R. at 590-91.) He noted Ford's prior positive tilt table testing, indicating he could not rule out a syncopal episode on August 30, 2011. (R. at 590.) An EEG was performed the following day, which yielded normal results, both awake and asleep. (R. at 594.)

When Ford returned to Dr. Vorkpor on September 6, 2011, she reported having three seizures the previous week and feeling weak. (R. at 579-81.) She was alert, oriented, cooperative and well-groomed, and a physical examination was normal. (R. at 579-80.) It was noted that because Ford had begun to have frequent seizures, the neurologist increased the dose of Keppra,[17] and Dr. Vorkpor advised

---

[17] Keppra is the brand name for the drug levetiracetam.

-16-

her to decrease her work hours at Walmart from eight to five hours daily. (R. at 581.)

Ford presented to the emergency department at Lonesome Pine on September 16, 2011, with complaints of a seizure and abdominal pain. (R. at 537-40.) A physical examination was normal, except for tenderness to the abdomen, and an ultrasound showed no gallstones. (R. at 537, 539.) Ford was diagnosed with chronic seizures and abdominal pain. (R. at 538.)

Ford continued to treat with Dr. Vorkpor from September 20 through October 7, 2011.[18] (R. at 570-77.) Over this time, Ford had various complaints, including weakness, neck pain, nausea and vomiting, headache, seizure, sore throat, dysphagia and fever. (R. at 570-77.) On each of these visits, Ford was alert, cooperative, oriented and well-groomed, and physical examinations were normal. (R. at 571, 574, 576-77.) Ford was diagnosed with an upper respiratory infection, a streptococcal infection, nausea and vomiting, seizure, migraine, gastroesophageal disease, ("GERD"), neck spasm and febrile illness. (R. at 572, 575, 577.)

Ford received additional treatment from Macdonald from October 6, 2011, through November 23, 2011. (R. at 588-89.) Lab work from September 2011 reflected that Ford's levetiracetam level was absent, suggesting medication noncompliance. (R. at 589.) Ford's mother indicated that she had done well in the past when she took her medication regularly. (R. at 589.) Over this time, Ford complained of daily headaches, neck and upper back pain, vomiting and seizures.

---

[18] On October 7, 2011, Ford saw Christina K. Hammonds, a nurse practitioner for Dr. Vorkpor.

(R. at 588-89.) Dr. Macdonald advised Ford to obtain an MRI of the brain, but she failed to do so. (R. at 588-89.) He prescribed Fioricet for headaches, advised Ford to take the levetiracetam and returned her to lamotrigine. (R. at 588-89.) Dr. Macdonald restricted Ford's driving until her seizures were controlled. (R. at 588.) A physical examination on November 23, 2011, was unremarkable, reflecting normal speech, no nystagmus or dysmetria, symmetric facial movements and full peripheral motor strength. (R. at 588.)

Ford continued to see Dr. Vorkpor from January 16 through February 15, 2012, with various complaints, including sore throat, vomiting, weakness and seizures. (R. at 600-08, 664-65.) Physical examinations were normal, and Ford was alert and oriented. (R. at 600-01, 605-06, 664-65.) Ford's diagnoses included urinary tract infection; conjunctivitis; seizure; migraine, stable; and GERD, stable; and Dr. Vorkpor prescribed antibiotics. (R. at 601, 603, 606, 665.) Lab work confirmed that Ford's Lamictal level was below normal range, suggesting medication noncompliance. (R. at 599, 601, 665, 667.) Dr. Vorkpor signed a letter on March 20, 2012, prepared by Ford's attorney, stating that he had limited Ford to working only five hours per day and no more than five days per week based on her seizure disorder. (R. at 617-18.)

Ford saw Eric Johnson, Ph.D., a psychologist, for a psychological evaluation at her attorney's referral on March 21, 2012. (R. at 610-13.) Ford reported anxiety since the age of 12 due to sexual abuse. (R. at 610.) She stated that she was not then-currently in therapy, but reported a psychiatric hospitalization in August 2009 when she threatened suicide. (R. at 610-11.) Ford denied then-current suicidal ideation, but was emotionally labile. (R. at 611.) Her daily activities included

visiting her grandmother and going out with her boyfriend. (R. at 611.) She reported having acquaintances, but no "real friends." (R. at 611.) Ford stated that she was uncomfortable in public and was unable to stay in a store for more than 10 minutes, but also stated that she was "not nervous in Walmart." (R. at 611.) She could dress and bathe independently and performed tasks at home, including doing laundry. (R. at 611.) Ford also reported occasionally attending church. (R. at 611.) She stated that she could not "stand to be alone." (R. at 611.) Johnson noted a psychological evaluation of Ford performed in 2006 to determine eligibility for special education services, on which she obtained a full-scale IQ score of 84. (R. at 611.) He also noted the psychological evaluation performed by psychologist Jones in February 2011, indicating that Ford's full-scale IQ score was 82. (R. at 611.) According to Johnson, Ford related well, but did not make consistent eye contact, and she wiggled her right leg. (R. at 611.) Hearing and speech were normal, but her mood was anxious. (R. at 611.) Ford was alert, logical in her thought processes and oriented. (R. at 611.) There were no signs of reality testing difficulties. (R. at 611.) Ford had only relatively mild difficulties with the mental status evaluation. (R. at 611.)

Johnson administered the Wechsler Abbreviated Scale of Intelligence, ("WASI"), the Word Reading subtest of the Wide Range Achievement Test – Fourth Edition, ("WRAT-IV"), and the Personality Assessment Inventory, ("PAI"). (R. at 612.) Scores argued against malingering on cognitive tests. (R. at 612.) On the WASI, Ford obtained a full-scale IQ score of 76, placing her in the borderline range of intelligence. (R. at 612.) On the WRAT-IV, she had a standard score of 79 and a grade equivalent of 5.1 on Word Reading. (R. at 612.) The PAI was deemed invalid, as Johnson felt Ford was exaggerating her symptoms based on

certain scores. (R. at 612.) Johnson opined that Ford had periods of depression and anxiety in response to the reactions of others. (R. at 612.) He further opined that a diagnosis of borderline personality disorder should be ruled out. (R. at 612.) Johnson noted that Ford's legitimate medical problems might be used for secondary gain. (R. at 612.) He did not believe that Ford had symptoms of PTSD. (R. at 612.) Johnson diagnosed anxiety disorder, not otherwise specified, with mixed anxiety and depression; rule out somatoform disorder; victim of sexual abuse of child, by report; rule out borderline personality disorder; and he assessed her then-current GAF score at 50.[19] (R. at 612.) He deemed her prognosis guarded, opined that she would not be a reliable employee and found that difficulties with co-workers and supervisors would be expected. (R. at 612.) He further opined that stress would be expected to exacerbate her medical problems. (R. at 612.) Johnson recommended psychological counseling, crisis intervention and psychiatric consultation. (R. at 613.) He noted that her psychological status would likely inhibit her ability to make occupational adjustments for more than a year. (R. at 613.)

Johnson also completed a mental assessment finding that Ford was moderately limited in her ability to understand, remember and carry out simple instructions and interact appropriately with the public, markedly limited in her ability to make judgments on simple work-related decisions, to understand, remember and carry out complex instructions and to interact appropriately with supervisors and co-workers and extremely limited in her ability to make judgments on complex work-related decisions and respond appropriately to usual work situations and to changes in a routine work setting. (R. at 614-16.) He opined that

---

[19] A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" DSM-IV at 32.

Ford would miss more than two workdays monthly due to her impairments or treatment. (R. at 616.)

Ford again saw Dr. Vorkpor on June 12 and July 27, 2012, with complaints of left ear pain, sore throat, cough, dysuria and lower back pain. (R. at 658-59, 661-62.) On both occasions, she was alert and oriented, and a physical examination was normal. (R. at 659, 662.) Dr. Vorkpor diagnosed acute sinusitis, left otitis externa, an upper respiratory infection, a urinary tract infection and nausea and vomiting, and he prescribed antibiotics. (R. at 659, 662.)

On August 3, 2012, Ford saw Dr. Douglas P. Williams, M.D., with Mountain Empire Neurological Associates, with complaints of seizures. (R. at 654-55.) Ford was oriented and in no acute distress. (R. at 655.) Dr. Williams noted a normal mental status examination, with normal affect and speech, appropriate fund of knowledge and no impairment of attention, concentration, or long- or short-term memory. (R. at 655.) A physical examination was unremarkable. (R. at 655.) Dr. Williams diagnosed complex partial seizure with secondary generalization, and he prescribed Lamictal and lamotrigine. (R. at 655.)

Ford treated with nurse practitioner Hammonds from August 29 through December 6, 2012, with complaints of sore throat, nausea and vomiting, possible seizures, ear pain, sinus pain and urinary tract infection symptoms. (R. at 12-22, 27-28.) Physical examinations were normal, except for some diffuse pharyngeal erythema, tenderness and drainage of the sinuses and deep tendon reflexes of 2/4 in both upper and lower extremities. (R. at 13, 18, 28.) Ford was consistently alert, cooperative and oriented, and on September 27, 2012, Hammonds noted that she

-21-

had no impairment of recent or remote memory, and she had normal coordination. (R. at 13, 18, 22, 28.) Lab work was ordered to check Ford's Lamictal level, and she was referred to a urologist. (R. at 22.) Ford also was given a Holter monitor to wear for 48 hours for bradycardia. (R. at 22.) Ford's diagnoses included sore throat, nausea and vomiting, seizure, urethral cyst, bradycardia and urinary tract infection. (R. at 14, 18, 22, 28.) In December 2012, Hammonds ordered lab work to check Ford's thyroid, and she restarted Lamictal. (R. at 14.)

On September 21, 2012, Ford saw Dr. Bryon Watson, D.O., with complaints of left-sided abdominal pain with nausea and vomiting. (R. at 23-25.) Ford was alert, cooperative and oriented, and a physical examination was unremarkable. (R. at 24.) Dr. Watson ordered a CT scan of the abdomen and pelvis, and he prescribed Zofran. (R. at 25.) A physical examination was normal, as were the results of the CT scan. (R. at 22, 24.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI adult claims.[20] *See* 20 C.F.R. § 416.920 (2014); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point

---

[20] While the ALJ's decision also denied any claim for SSI benefits prior to Ford attaining age 18, it does not appear that Ford is contesting that portion of the ALJ's decision.

in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2014).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2014); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Ford argues that the ALJ erred by failing to fully address all the evidence of record and indicate the weight given thereto. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) In particular, Ford argues that the ALJ failed to explain why he rejected Dr. Vorkpor's opinion regarding the frequency and duration of her seizures. (Plaintiff's Brief at 5.) Ford also argues that the ALJ erred by failing to give full consideration to the findings of psychologist Johnson regarding the severity of her mental impairments and their resulting effects on her ability to work. (Plaintiff's Brief at 5-6.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by

substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

"It is well-settled that 'the [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight.'" *Payne v. Barnhart*, 366 F. Supp. 2d 391, 401 (W.D. Va. 2005) (quoting *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979)). However, "[t]he courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight [s]he has given to obviously probative exhibits, to say that [her] decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Payne*, 366 F. Supp. 2d at 402

(quoting *Arnold v. Sec'y of Dep't of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Ford argues that the ALJ failed to sufficiently explain why he rejected Dr. Vorkpor's opinion that she would suffer six seizures every two to three months lasting three to five minutes each. (Plaintiff's Brief at 5.) I disagree. The ALJ gave partial weight to Dr. Vorkpor's opinion that Ford was limited to working 25 hours per week due to seizures and that every two to three months she would experience six seizures lasting from three to five minutes. (R. at 51.) As the Commissioner notes in her brief, the ALJ agreed with Dr. Vorkpor's finding that Ford could not perform full-time work as a cashier/checker at Walmart given the skill and social interaction that job required. (R. at 51.) However, the ALJ did not agree with Dr. Vorkpor's opinion that Ford's seizure disorder would prevent her from performing less stressful jobs requiring less social interaction on a full-time basis. For the reasons that follow, I find that the ALJ's sufficiently explained his decision to give partial weight to Dr. Vorkpor's opinion.

The ALJ, throughout his decision, indicates multiple reasons that Dr. Vorkpor's opinion is entitled to only partial weight. For instance, the record evidenced that Ford suffered seizures fairly infrequently during the relevant period, and, when she did, she typically was not taking her medication as prescribed. During the relevant period, Ford's first complaint of a possible seizure was on January 18, 2011, more than a year after her alleged onset date. However, in February 2011, Ford informed psychologist Jones that her last seizure was in October 2010. Treatment notes from October 2010 reflect a diagnosis of complex migraine. On August 9, 2011, Ford reported a possible seizure three days

previously, but she admitted that she had reduced the dosage and frequency of her medication. On August 30, 2011, Ford reported another possible seizure episode during which she bit her tongue, but no tongue laceration was appreciated, and Dr. Macdonald felt Ford might have had a syncopal episode. On September 6, 2011, Ford reported three seizures the previous week. She presented to the hospital on September 16, 2011, with complaints of a seizure, and on October 4, 2011, she reported a seizure the previous week. On October 6, 2011, Ford reported to Dr. Macdonald having three seizures since her last visit to him in August 2011. However, lab work performed on September 28, 2011, showed that her prescribed medication was absent, evidencing medication noncompliance. On November 23, 2011, she reported only one seizure since her last visit. On February 15, 2011, Ford reported three seizures the previous week, but lab work again revealed medication noncompliance. On September 27, 2012, Ford reported an "episode" that morning, but was not sure if it was a seizure. On December 6, 2012, Ford reported a seizure that morning. The record speaks for itself that Ford's seizures remained well-controlled when she was medication-compliant, and both Ford and her mother admitted that her medications helped control her seizures. If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Furthermore, the ALJ explained that, despite Ford's claim of a disabling seizure disorder, she sought no neurological care from November 2011 through August 2, 2012, the date of the decision. Ford did see Dr. Williams, a neurologist, on August 3, 2012, the day after the ALJ's decision. Ford's mental status was normal, and a physical examination was entirely unremarkable at that time. The ALJ also stated that Ford complained of seizures to Dr. Vorkpor only once during

2012. The court notes that she did complain to Hammonds, Dr. Vorkpor's nurse practitioner, on two other occasions during 2012. In any event, only three complaints were voiced during all of 2012 to Dr. Vorkpor's practice, one of which Ford described as an "episode" and which she was unsure if it was a seizure. Moreover, the ALJ explained that Ford's physical examinations during the relevant period generally were normal, reflecting that she was alert, oriented and cooperative with normal speech, no nystagmus or dysmetria, symmetric facial movements and full peripheral strength.

Additionally, the ALJ explained that Dr. Vorkpor's opinion is not supported by the state agency physician's findings that Ford could perform a range of light work requiring no more than occasional climbing of ramps and stairs and no climbing of ladders, ropes or scaffolds, nor is it supported by Dr. Macdonald's failure to impose any work-preclusive limitations on Ford. The ALJ correctly notes that the opinion of Dr. Macdonald, Ford's treating neurologist, generally should be given more weight than the opinion of a nonspecialist. *See* 20 C.F.R. § 416.927(c)(5) (2014).

It is for all of these reasons that I find that the ALJ sufficiently explained why he gave only partial weight to Dr. Vorkpor's opinion. For the reasons that follow, I also find, contrary to Ford's argument, that the ALJ did not err by failing to give full consideration to the findings of psychologist Johnson regarding the severity of her mental impairments and their resulting effects on her ability to work.

Psychologist Johnson found that Ford would not be a reliable employee, would have difficulties with co-workers and supervisors, could not make occupational adjustments, that stress would be expected to exacerbate her medical problems, that she would not be able to manage her own funds independently and that she had a GAF score of 50, indicating serious symptoms or limitations. The ALJ gave this opinion little weight because Ford had demonstrated an ability to handle at least the cognitive aspects of a semi-skilled cashiering job, and she had undergone very minimal treatment overall for her mental impairments. Instead, the ALJ gave great weight to the opinions of psychologists Jones and Whitehead and the state agency psychologist, McClain. I find that substantial evidence supports the ALJ's weighing of the psychological evidence.

The ALJ is correct that Ford's mental health treatment generally produced normal findings on mental status examination. For instance, in February 2010, Ford advised Dr. Vorkpor that she suffered from anxiety, but not depression, and she reported previous suicidal ideation. However, Dr. Vorkpor did not prescribe any treatment at that time. Ford raised no further psychiatric complaints to Dr. Vorkpor until May 2010, when she reported panic attacks, which had begun only "several days to a week" prior to this visit, and which were aggravated by an ex-boyfriend's death in a motor vehicle accident. Dr. Vorkpor prescribed a month's supply of Xanax for panic disorder and anxiety, noting that he would reevaluate Ford in one month to determine whether she needed long-term medication. As the ALJ stated, the Xanax must have helped her symptoms, as she denied any anxiety on a review of symptoms at an emergency room visit just a few days later.

-28-

There also is no evidence that Ford continued to complain of any psychiatric symptoms or that she continued with any psychiatric treatment. In fact, Dr. Vorkpor's treatment notes evidence that Ford generally denied any psychiatric symptoms in reviews of symptoms. Additionally, Dr. Vorkpor repeatedly found that Ford's mental status and appearance were normal, noting that she was alert, oriented, cooperative, well-groomed and in no acute distress.  In September 2010, Dr. Vorkpor even described Ford as "calm" and noted that she had "no other [psychiatric] complaints." Furthermore, Ford voiced no psychiatric complaints during her various emergency room visits during the relevant period.  Specifically, her mood and affect were normal, and she denied any depression or anxiety on reviews of systems. Moreover, Dr. Shepherd's treatment notes from July 2010 through September 2010 indicated normal findings on psychological reviews of systems.

Ford's February 2011 psychological evaluation by Jones and Whitehead reflected that she was very neatly dressed with excellent grooming and hygiene, and her affect was only mildly blunted. Eye contact was excellent, she was extremely cooperative and exhibited a high degree of motivation and persistence to task and did not exhibit any significant memory problems.  Jones and Whitehead indicated that Ford did not appear to have any difficulty with attention or concentration, and she followed directions without repetition. While she did exhibit some anxiety with mild psychomotor agitation and needed reassurance and asked questions regarding performance during the intelligence tests, she showed no evidence of any distorted thought processes, she was rational and alert, and her stream of conversation was appropriate. Ford had no difficulty relating to the examiner, and she denied any then-current dangerous ideation.  Ford's results on

-29-

the WAIS-IV yielded a full-scale IQ score of 82, placing her in the low average range of intellectual functioning, but Jones and Whitehead noted that she had achieved a math computation score of 92 on the WRAT-IV in 2006, which was thought to be indicative of an ability to manage finances.

By contrast, when Johnson administered the WAIS-IV, Ford scored in the borderline range, considerably lower than her previous scores. However, the ALJ noted that he was giving little weight to this testing, as the results appeared to be partially secondary to Ford's lack of effort. Specifically, Johnson stated that Ford gave up easily on a portion of the WAIS-IV testing, which he opined could be due to lack of motivation. However, the previous intelligence testing from October 2006 and February 2011 were commensurate with each other, and the ALJ gave these scores greater weight. Johnson also opined that Ford was exaggerating symptoms based on her score on the PAI, and he noted that her legitimate medical problems might be used for secondary gain.

Moreover, the ALJ correctly noted that Ford had been diagnosed with PTSD prior to the alleged onset date, but not thereafter, and Johnson opined that she did not appear to have PTSD symptoms. Ford's own testimony and statements also support the ALJ's decision to give little weight to Johnson's opinion. For instance, Ford testified that she could work in a simpler job where she did not deal with people. However, at the time of the ALJ's decision, Ford was working part-time as a cashier at Walmart, a job which required her to deal with people, and which the vocational expert classified as semi-skilled. Ford also reported no cognitive difficulties performing this job. The ALJ further noted the inconsistency between Ford's testimony that she suffered from panic attacks while working at Walmart

-30-

and her statements to an examining psychologist that she was not nervous at Walmart. The ALJ accurately stated that the treatment notes do not reflect continuing complaints of panic attacks. Ford only complained of panic attacks in May 2010, after her ex-boyfriend died in a motor vehicle accident. At a follow-up appointment one month later, however, she made no mention of anxiety or panic attacks, nor did she make any further mention of panic attacks to any treating provider. Finally, Ford's activities of daily living included visiting her grandmother, going out with her boyfriend, doing laundry, making her bed, keeping her room clean, helping her grandmother fix breakfast and cleaning up, using a cell phone and, more recently, occasionally attending church. She also stated a desire to pursue a nursing career. Her self-help skills were deemed excellent, and initiative and effectiveness appeared adequate. Such activities belie any contention of a disabling psychiatric impairment.

The ALJ gave great weight to the opinions of consultative psychologists Whitehead and Jones, as well as McClain, the state agency consultative psychologist, as these opinions generously accommodated Ford's alleged limitations, such as difficulty being around people, but also were consistent with the many normal findings on mental status examination, her limited treatment and her ability to perform some part-time work and significant activities of daily living. Without repeating their findings in its entirety, Whitehead and Jones opined that Ford had mild limitations in her ability to understand and remember and in her ability to sustain concentration and persistence; she would have difficulty with detailed instructions, but could understand and remember simple instructions; she might have difficulty working in coordination with others and may have difficulty dealing with the general public and co-workers; would have no difficulty relating

to others and would maintain excellent standards of neatness and cleanliness; would be mildly limited in the area of adaptation and may have difficulties setting realistic goals and making plans independently of others; that she could be aware of normal hazards and take appropriate precautions; and they assessed her GAF score at 60, indicating moderate symptoms or moderate difficulty in social, occupational or school functioning.

McClain, the state agency psychologist, adopted Whitehead's and Jones's opinion in assessing Ford's mental limitations, opining that Ford was mildly restricted in her activities of daily living and in maintaining concentration, persistence or pace, moderately limited in maintaining social functioning and had experienced no episodes of decompensation of extended duration.

Based on Ford's lack of persistent psychiatric complaints during the relevant period, her limited mental health treatment, her consistently normal mental status examinations, her ability to perform at least some part-time semi-skilled work and her ability to perform fairly significant activities of daily living, I find that the ALJ's weighing of the psychological evidence is supported by substantial evidence. That being so, I further find that substantial evidence supports the ALJ's finding as to Ford's mental residual functional capacity. An appropriate order and judgment will be entered.

DATED:     March 30, 2015.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-32-